Erwin J. Shustak, Esq. (ES 5617)
shustak@shufirm.com
SHUSTAK & PARTNERS, P.C.
400 Park Avenue
New York, NY 10022
Telephone: (212) 688-5900
Facsimile: (212) 688-6151

Attorneys for Plaintiff



08 CV 03150

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL LIGHTING COMPANY, INC., a New Jersey Corporation, <br><br> Plaintiff, <br><br> vs. <br><br> BRIDGE METAL INDUSTRIES, LLC, a New York Limited Liability Company; JOSEPH MESSA, an individual; GALAXY SWITCHGEAR INDUSTRIES, LLC, a New York Limited Liability Company; BLAISE FREDELLA, an individual; ISAK LEMBERG, an individual; BORIS BREGMAN, an individual; PICASSO LIGHTING INDUSTRIES LLC, a New York Limited Liability Company; INDEPENDENT LIGHTING, LLC, a New York Limited Liability Company; GREEN LIGHT SOLUTIONS, LLC; and MITCHELL BLOOMBERG, an individual, <br><br> Defendants. | Case No. <br><br> COMPLAINT AND JURY TRIAL DEMAND |

Plaintiff, NATIONAL LIGHTING COMPANY, INC. ("National"), through its attorneys, SHUSTAK & PARTNERS, P.C., complaining of Defendants BRIDGE METAL INDUSTRIES, LLC ("Bridge"), JOSEPH MESSA ("Messa"), GALAXY

SWITCHGEAR INDUSTRIES, LLC ("Galaxy"), BLAISE FREDELLA ("Fredella"), ISAK LEMBERG, ("Lemberg"), BORIS BREGMAN ("Bregman"); PICASSO LIGHTING INDUSTRIES, LLC ("Picasso"); INDEPENDENT LIGHTING, LLC ("Independent"); GREEN LIGHT SOLUTIONS, LLC ("Green Light"); and MITCHELL BLOOMBERG ("Bloomberg") (referred to collectively herein as "Defendants"), as and for its Complaint alleges, upon information and belief except as otherwise particularly stated, as follows:

## JURISDICTION AND VENUE

1.  This Court has jurisdiction over this action pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367.

2.  The state claims in this action are brought pursuant to this Court's ancillary and pendent jurisdiction over such claims.

3.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as Defendants' conduct occurred and continues to occur in this judicial district.

## THE PARTIES

4.  Plaintiff National is and was at all times relevant to this action a corporation organized under the laws of the state of New Jersey, with its principal place of business at 522 Cortlandt Street, Belleville, New Jersey 07109.

5.  Defendant Galaxy is and was at all times relevant to this action a Limited Liability Company doing business in New York and organized under the laws of the state of New York, with its principal place of business at 717 South Third Avenue, Mount Vernon, New York 10550.

6.  Defendant Bridge is and was at all times relevant to this action a Limited Liability Company doing business in New York and organized under the laws of the state of New York, with its principal place of business at 717 South Third Avenue, Mount Vernon, New York 10550.

7.  Defendant Messa is and was at all times relevant to this action an individual residing in the state of New York, and the President of Galaxy and Bridge.

8.  Defendant Fredella is and was at all times relevant to this action an individual residing in the state of New York, and an officer, director, and employee of Galaxy and Bridge.

9.  Defendant Lemberg is and was at all times relevant to this action an individual residing in the state of New York, and an officer, director, and employee of Galaxy and Bridge.

10.  Defendant Bregman is and was at all times relevant to this action an individual residing in the state of New York, and an officer, director, and employee of Galaxy and Bridge.

11.  Defendant Picasso is and was at all times relevant to this action a Limited Liability Company doing business in New York and organized under the laws of the state of New York, with its principal place of business at 717 South Third Avenue, Mount Vernon, New York 10550.

12.  Defendant Independent is and was at all times relevant to this action a Limited Liability Company doing business in New York and organized under the laws of the state of New York, with its principal place of business at 92 Hazelwood Drive, Jericho, New York 11753.

13. Defendant Green Light is and was at all times relevant to this action a Limited Liability Company doing business in New York and organized under the laws of the state of New York, with its principal place of business at 92 Hazelwood Drive, Jericho, New York 11753.

14. Defendant Bloomberg is and was at all times relevant to this action an individual residing in the state of New York, and an officer, director, and employee of Independent, and Green Light. Bloomberg is the former president of The Lighting Group of New York City. The Lighting Group of New York City was owned and operated by Genlyte Lightolier Thomas Group, a New York Limited Liability Company whose public records reflect hundreds of millions of dollars in annual revenues and which was, upon information and belief, acquired in 2008 by Royal Phillips Electronics, N.V., manufacturer of the well-known "Phillips" brand electronics.

15. Evidence which will be gathered during discovery and presented at trial will show that each Defendant was at all times relevant hereto a controlling person, agent, and/or alter ego of each other Defendant, and in doing the acts as herein alleged, was acting within the course and scope of his or its authority as such with the expressed and implied permission, instruction, knowledge, consent, and ratification of each other Defendant. Each Defendant did influence and govern each other Defendant with such a degree of unity of interest and ownership so that the individuality, or separateness, of each Defendant have ceased to exist.

16. National alleges that the facts hereafter are such that an adherence to the fiction of the separate existence of the Defendants would sanction a fraud or promote a miscarriage of justice.

## SUMMARY OF THE CASE

17.    This case arises out of a scheme and conspiracy amongst all of the Defendants whereby they conspired to and did cause Bridge to intentionally breach a confidentiality agreement between National and Bridge dated July 28, 2005 (the "Confidentiality Agreement" or "Agreement", a true and correct copy of which is marked and attached hereto as Exhibit "A").  The other Defendants were co-conspirators with, and alter egos of Bridge, and participated in the decision to have Bridge breach the Agreement with the intent, and for the purpose of allowing the Defendants to purloin, at no cost and for no payment to National, National's trade secrets, business operations, technical know-how and other intellectual property and enter the architectural fluorescent lighting business with the intention of unlawfully competing with National and stealing National's customers and business.

18.    National is a well-established, nationally recognized company that has been engaged in the business of manufacturing and designing fluorescent lighting fixtures for installation in commercial offices, educational facilities and government buildings since 1941.  National was one of the first companies in the United States to enter the business of manufacturing fluorescent lighting fixtures, which it did shortly after the fluorescent light bulb was introduced at the 1939 New York World's Fair.   From 1941 until approximately 2005, National manufactured all of its own lighting fixtures at its plant located in Belleville, New Jersey.

19.    In or about late 2004, early 2005, National met with Bridge, Galaxy and the various individuals associated with those entities (including those named as defendants herein) (Bridge, Galaxy and the individuals names as defendants and associated with

Bridge and Galaxy are collectively referred to as the "Bridge Defendants") and entered

into negotiations to have Bridge/Galaxy manufacture National products for National.

National felt, at the time, that Bridge/Galaxy could manufacture the actual lighting

fixtures and stamped metal housings at a more economical price than National. During

the first half of 2005, there were negotiations between representatives of National and all

of the individual Defendants, other than Bloomberg, regarding an agreement between

National and Bridge/Galaxy whereby Bridge/Galaxy would manufacture various lighting

fixtures, housings and other materials for National. National, however, was concerned

that it be able to protect all of its technical know-how, garnered over the course of more

than sixty years of business, trade-secrets and other intellectual property before giving

that highly valuable information to Bridge/Galaxy.

20. On or around July 28, 2005, following months of negotiations, National and

Bridge entered into the Agreement and Bridge/Galaxy began to manufacture and

assemble for National lighting fixtures, housings and other parts to be incorporated into

National lighting fixtures. In furtherance of the Agreement, and relying upon the terms

of the Agreement, National did provide the Bridge Defendants with trade secrets

comprised of confidential drawings, formulas, designs, documentation, on-hands training

and seminars, and other information (the "Confidential Information") for the purpose of

manufacturing National's products. The Bridge Defendants agreed not to disclose the

Confidential Information except for those purposes and to those individuals designated in

the Agreement. National also provided its employees to show the Bridge Defendants

how to manufacture National's products and parts and explain to the Bridge Defendants

all of the technical information and knowledge required to manufacture National lighting

fixtures. Prior to entering into the Agreement, none of the Bridge Defendants had been in the business of manufacturing any kind of lighting fixtures, including but not limited to fluorescent lighting fixtures. Any knowledge the Bridge Defendants obtained regarding the manufacture of fluorescent lighting fixtures was acquired from National and covered, at all times, by the terms of the Agreement.

21. In or around November 2007, National discovered that the Bridge Defendants had breached the Agreement and, in concert with the other named Defendants, had purloined and stolen for their own use and benefit and were using National's designs, technical know-how, drawings and other intellectual property specifically covered by the Agreement for Defendants' exclusive benefit to manufacture and market their own lighting fixtures. Upon information and belief, Defendants continue to act in concert to manufacture, market and sell fixtures using the designs the Bridge Defendants misappropriated from National, palming off the products as their own to National's clientele.

22. Defendants' conduct as alleged herein constitutes violations of federal law under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125 and of the laws of the state of New York as set forth herein. As a result of Defendants' conduct, National has suffered and will continue to suffer damages and accordingly bring this action for monetary and injunctive relief.

## MATERIAL ALLEGATIONS

### National Lighting's Business History

23. National is one of the country's pioneer manufacturers and designers of fluorescent lighting fixtures, first marketing its products to the public shortly after the

fluorescent light bulb was introduced in 1939 at the World's Fair. Since 1941, National has manufactured high quality, architectural grade lighting fixtures for commercial, educational, hospital, governmental and other large-scale facilities. It produces the fixtures at its plant in Belleville, New Jersey.

24. National markets its products throughout the United States using various independent sales agencies. A significant portion of its clientele is situated in the Northeastern United States. National's products are currently installed in most major office buildings in the New York tri-state vicinity and in various structures throughout the country.

**National Lighting's Products and their Inherently Distinctive Trade Dress**

25. Since its inception, National has invested enormous amounts of time, money and other resources into developing distinctive products which contractors, owners, architects and lighting consultants and engineers readily associate with National. Through years of hard work and effort, and the expenditure of substantial monies, National's fixtures carry a trade dress recognized by its customers, end users and others in the lighting industry as exceptionally aesthetic, superior in quality, and easy to assemble. Its fixtures are installed in every major office building in New York City, including the iconic Chrysler and Empire State Buildings.

26. To National's knowledge, there are, throughout the country, between approximately fifteen to twenty-five other fluorescent lighting fixture manufacturers (besides Defendants), some of which have billions of dollars in annual sales revenues, who market products somewhat comparable to National's. The National products, however, are inherently distinctive from those manufactured by any of the other lighting

manufacturers it considers its competitors. Each manufacturer's products' trade dress is visibly different from the others in manners such as the positioning of the fluorescent bulb, the distribution of light from the bulb, the angle at which the metal frame is curved, the placements of screws, the appearance of the inside parts, the method of wiring, the shielding design and shielding width, fixture depth, and the overall color and texture combinations. Fluorescent lighting fixtures require a substantial amount of engineering, both in terms of the design and fit of the fixture housing and parts, and in terms of the amount, quality and location of the light they generate.

27.    National has developed a trade dress with a total image so distinct that a quick examination of these factors will cause its customers, potential customers and those involved in the selection and purchasing of lighting fixtures for commercial use to instantly recognize the origin of its product as National's. So distinctive are National's products, in fact, that many architects and engineers in the country specify National's fixtures in the plans they draw up for buildings. These individuals are known in the lighting industry as "specifiers" and they specify, when plans are drawn for any kind of renovation or construction, which brand of fluorescent light fixtures are to be used.

28.    National's designs, formulas and methods for creating its fixtures were trade secrets and proprietary information developed and owned by and known only to National and its representatives until 2005, when National entered into the Confidentiality Agreement. Prior to then, National kept its designs, formulas and methods private, to maintain its products' distinctive trade dress. For example, National's fixtures are assembled in a certain manner that, without proper training from a National representative, would be exceedingly complicated, time-consuming and expensive to

duplicate.   As described below, National provided such training, methodology, and design to the Bridge Defendants only after the Bridge Defendants agreed to and executed the Confidentiality Agreement.   National never revealed its trade secrets to another company prior to entering into the Agreement.   It continues to take special efforts to protect the confidence of its trade secrets, including filing this action against Defendants.

29.   In addition to developing its products, National has invested a great deal of time and effort into creating customized fixtures tailored to meet its customers and potential customers' specific needs.   This involves building a relationship of trust with the individual end user, specifier, architect or contractor, working closely with them to ascertain the best possible, most appropriate National product for the job and engineering for them a perfectly designed fixture to function in its required capacity.   The amount of goodwill National has amassed through its efforts in this regard is so vast it cannot be quantified and the loss of that goodwill would be extremely difficult if not impossible to quantify.

30.   To date, National's efforts have culminated in a distinctive product that carries a secondary meaning, which its longstanding consumers correlate with National origination.

**The Confidentiality Agreement and Potential Merger**

31.   Prior to entering into the Agreement with National, the Bridge Defendants were never in the business of making commercial fluorescent lighting fixtures.   Instead, they manufactured products such as one or two residential, non-fluorescent lighting fixtures, switchgear and switchboard apparatus, HVAC (Heat Ventilation Air Conditioning) duct work, and a vast array of display products for Bridge Metal

Industries. Their first foray into the architectural specification grade fluorescent lighting business occurred when National began considering a merger transaction (the "potential merger") with Galaxy and Bridge in or around 2005.

32. The details and parameters of the potential merger are set forth in an unsigned yet circulated letter of intent by National, Galaxy and Bridge dated July 2005, wherein the parties defined specific aspects of the potential merger such as asset acquisition, representations and warranties, closing date, and a license agreement. (A true and correct copy of this July 2005 letter of intent is marked and attached hereto as Exhibit "B".) The July 2005 letter is unsigned but sets forth those terms which National, Galaxy and Bridge collectively understood would define the potential merger and reflects the status of their collective negotiations and discussions as of July, 2005.

33. In early 2005, National entered into negotiations with the Bridge Defendants for an arrangement whereby they would manufacture National products *for National exclusively.* After negotiation between the parties, in anticipation of the potential merger, National required the Bridge Defendants to sign the Confidentiality Agreement. Bridge signed the Confidentiality Agreement on behalf of itself and, acting as Galaxy's agent, alter ego, and otherwise controlling entity on behalf of Galaxy. Defendants Mesa and Fredella had meetings with National both before and after the Agreement was signed in the company of National's accountant. Mesa and Fredella clearly conducted themselves at those meetings as Galaxy's decisionmakers. Defendants Bregman and Lemberg acquiesced to these discussions.

34. Pursuant to the Confidentiality Agreement, and relying upon it and the protection it provided, National agreed to provide the Bridge Defendants with the

Confidential Information, comprised of trade secrets including but not limited to: drawings, formulas, designs, specification sheets, cut sheets, computer generated images, instructions for assembly, actual fixture samples, and hands-on training seminars. (See Exh. A.) The parties to the Confidentiality Agreement agreed that the Bridge Defendants would use National's trade secrets solely to manufacture the fixtures for National, to allow National to evaluate the merits of the potential merger. (See Exh. A.)

35.    Over the course of several months, National provided to the Bridge Defendants the Confidential Information, as provided by the Confidentiality Agreement. Representatives from National worked closely and regularly with Galaxy's and Bridge's employees and representatives to instruct them on manufacturing techniques. National also informed them where to purchase certain necessary parts and revealed to them National's longstanding clientele's contact information. All of this instruction and information were trade secrets protected under the Confidentiality Agreement. Relying upon the Agreement, National essentially taught the Bridge Defendants the entire business of designing, manufacturing and engineering National lighting fixtures.

36.    After months of assessing the working relationship between National and the Bridge Defendants, National decided against the potential merger and those negotiations ended. The Bridge Defendants did continue to manufacture, for National, National lighting fixtures and the Confidentiality Agreement continued in full force and effect.

37.    In or around 2006, National made it clear to the Bridge Defendants that the potential merger would not be consummated, upon which the Bridge Defendants were immediately obligated under the Agreement to either destroy all originals and copies of

Confidential Information or return it all to National. (See Exh. A.) The Bridge Defendants continue to be bound by the Confidentiality Agreement.

**Bridge Defendants' Misappropriation and Breach of the Confidentiality Agreement**

38.   In late 2007, National learned that instead of destroying or returning the Confidential Information, the Bridge Defendants had conspired to and had caused Bridge to breach the Agreement and were using the Confidential Information without National's permission to manufacture, market, and sell products apparently identical to National's.

39.   The President of National personally visited Galaxy's and Bridge's showroom in late 2007 and saw firsthand that Defendants had created National-like fixtures, virtual clones of the National product line, which were being marketed to the public in Defendants' showroom. National's President instantly recognized the products as clones of National's products and inquired about them with a Defendant representative, who is in fact named Defendant Lemberg. (True and correct copies of brochures of National's products and photos of Defendants' showroom displaying Defendants' National-like fixtures are collectively marked and attached hereto as Exhibit "C".)

40.   Lemberg proudly proclaimed to National's President that Defendants were now in the business of manufacturing and selling to National's customers and potential customers architectural grade fluorescent lighting.

Lemberg then proceeded to hand National's President specification sheets (collectively, the "specification sheets") for certain National lighting fixtures, stating that Defendants could and would manufacture lighting fixtures identical to those set forth in the specification sheets. The specification sheets were designed, created, manufactured,

and published *by National* and in fact were part of the Confidential Information National provided to the Bridge Defendants pursuant to the Confidentiality Agreement. (True and correct copies of the specification sheets which Defendants' representative provided to National's President, indicating specifications for National lighting fixtures and bearing National's name, logo, address and other identifying information, are marked and attached collectively hereto as Exhibit "D".) Lemberg, in the course of selling switchgear to electrical distributors (to some of whom National was selling specification grade lighting fixtures) solicited fixture business on a regular basis, routinely shredding the Confidentiality Agreement, and telling the potential clientele he was manufacturing for National but could manufacture fixtures just like National's for a less expensive price. Upon information and belief, one of the customers Lemberg routinely solicited is now an employee of Picasso and/or Green Light.

**Tortious Interference by Bloomberg and the Bloomberg Entities**

41.    National recently has learned that, after the Bridge Defendants breached the Confidentiality Agreement, the Bridge Defendants conspired with Bloomberg to form the entities Picasso, Green Light, and Independent. Picasso, Green Light, and Independent (referred to collectively as the "Bloomberg Entities") were formed to act, and are acting, in concert with Bloomberg and the Bridge Defendants to handle the marketing of the lighting fixtures cloned from the National Product line.  Bloomberg also has been and currently is assisting the other Defendants to manufacture, engineer, create, market, advertise, and sell fluorescent lighting fixtures based on the Confidential Information the Bridge Defendants wrongfully purloined from National.

42. Prior to the creation of the Bloomberg Entities, Bloomberg had approached National purportedly to discuss an arrangement whereby Bloomberg would become the prime sales representative for National and, if National were sold, Bloomberg, who told National he could increase their sales volume and make National an attractive takeover target for another lighting manufacturer, would receive a substantial sum from any sales price. National disclosed to Bloomberg in the course of these negotiations several aspects of the relationship between National and the Bridge Defendants, including: the potential merger, the disclosure of Confidential Information by National to the Bridge Defendants pursuant to the Confidentiality Agreement, and the tutelage and training National provided to the Bridge Defendants.

43. As part of these discussions Bloomberg also considered forming a sales agency with National to market National's products. Bloomberg instead formed the defendant entity "Picasso" as a vessel to duplicate the National line of products. After forming Picasso, Bloomberg continued to carry on negotiations for an equity interest in National, questioning National's President about National's relationship with the Bridge Defendants. Ultimately, Bloomberg used the information gleaned from National's President to act in concert with Defendants as described herein. National believes that Bloomberg, at all material times, already was acting in concert with the other Defendants and was a conspirator in their plan to tortiously interfere with the Confidentiality Agreement and induce Bridge to breach that Agreement.

44. Bloomberg was aware of the Agreement and its terms and conditions from his discussions with National. In addition, prior to filing this litigation, National put

Bloomberg on notice of the actual terms and conditions of the Agreement by forwarding to him a copy of the Agreement.

45. At all times relevant to this action, Bloomberg and the Bloomberg Entities acted in concert and as each other's controlling person, controlling entity, agent, and/or alter ego. Bloomberg and the Bloomberg Entities had, at all times relevant to this action, personal knowledge of the valid Confidentiality Agreement between National and the Bridge Defendants.

46. Upon information and belief, Bloomberg used his knowledge and standing in the lighting industry as the former president of The Lighting Group of New York to influence, encourage, pressure, and/or solicit the Bridge Defendants to breach the Confidentiality Agreement. In so doing, Bloomberg and the Bloomberg Entities deliberately interfered with, and intentionally procured the breach of, the Confidentiality Agreement by the Bridge Defendants. By conspiring with the Bridge Defendants to manufacture, market and sell products created from the purloined Confidential Information, Bloomberg and the Bloomberg Entities continue to interfere in the contractual relationship between National and the Bridge Defendants.

47. The conduct of Bloomberg and the Bloomberg Entities was and is intentional, willful, wanton, malicious, oppressive, and reckless. As a direct and proximate result of their conduct, and the Bridge Defendants' breach of the Confidentiality Agreement, National suffered and continues to suffer damage in an amount according to proof.

**Defendants' Lanham Act Violations Including Trade Dress Infringement and Reverse Palming Off; Unfair Competition; and Tortious Interference with National's Prospective Economic Relations**

48. Upon information and belief, Defendants are now collectively manufacturing and selling, to National's customers and potential customers, lighting fixtures based on the Confidential Information and trade secrets they misappropriated from National. Defendants are also marketing to National's very same clientele these unlawfully manufactured lighting fixtures. Upon information and belief, Defendants have entered the architectural grade lighting market in metropolitan New York, where the bulk of National's clients are located, and have sold to at least one third party products they tout as identical to National's without National's permission or approval.

49. As National's President has personally witnessed, Defendants' products are so similar in appearance to National's and infringe on National's distinct trade dress such that that there is a substantial likelihood the general consuming public will be confused as to the identity and origin of Defendants' fixtures. Indeed, Defendants' products are created using the very same specifications created by National and are clones of the National products. Upon information and belief, Defendants have sold fixtures based on National's specifications, palming them off as their own. Defendants' conduct, including their causing a likelihood of confusion among the consuming public, constitutes infringement and dilution of the trade dress of National's products.

50. Defendants not only have purloined National's confidential trade secrets. They also attempt to rob National of its hard-earned goodwill. Under the auspices of the Confidentiality Agreement, National provided Defendants with the identities and contact information of several of their clients. Many of them have been National's customers for

over half a century. National has cultivated products with these clients over the years, presenting fixtures and fine-tuning them over periods of several years to achieve acceptance under the clients' standards.

51.    Defendants unfairly are using the misappropriated trade secrets and intentionally confusing consumers as to the designation of their products, all on the secondary meaning associated with National's fixtures and the considerable goodwill developed exclusively by National. Defendants are acting in concert to palm off their products as identical to National's to the same clientele to whom National has catered for over fifty years. Without the trade secrets National diligently developed over the course of sixty-six (66) years, Defendants would be irrelevant in the lighting fixture specification community for many years before becoming recognized and accepted.

52.    By purloining National's trade secrets, Defendants have entered the lighting fixture market years earlier than they would have without the trade secrets. They wrongfully attempt to gain an unfair advantage over National by using pilfered trade secrets to jump-start their entry into the business, and to falsely advertise and deceptively palm off their products so as to confuse and deceive the public about the true origin of the fixtures. Defendants' conduct amounts to unfair competition against National. Defendants' conduct, including its unfair competition against National, has directly and proximately caused, and continues to cause, interference with National's Confidentiality Agreement and its prospective economic relations with existing and potential clientele.

53.    Defendants' conduct was and is intentional, willful, wanton, malicious, oppressive, and reckless. The conduct of each of the Defendants, and all of them, acting in concert and as each other's controlling person, controlling entity, agent, and alter ego,

constitutes violations of federal law under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125 and the laws of the state of New York as set forth herein, as well as other independent, actionable torts. Defendants' conduct is further unjustly enriching the Defendants at the expense of National.

54.  As a result of Defendants' conduct, National has suffered damages, and will continue to suffer damages, in an amount according to proof but believed to be in excess of thirty million dollars ($30,000,000.00). Unless the declaratory and injunctive relief requested herein are granted, National will likely suffer irreparable injury as a result of Defendants' conduct. Accordingly, National brings this action for monetary damages and injunctive relief.

## FIRST CAUSE OF ACTION
### Trade Dress Infringement
### (Against All Defendants)

55.  National realleges and reasserts each allegation set forth above as if fully set forth herein.

56.  Defendants' conduct as alleged herein constitutes infringement of National's trade dress, in violation of Section (43)(a) of the Lanham Act, 15 U.S.C. § 1125(a). As a direct and proximate result of Defendants' conduct, National has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

57.  Defendants' conduct as alleged herein is and was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting enhanced, treble and punitive damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## SECOND CAUSE OF ACTION
### Trade Dress Dilution
### (Against All Defendants)

58.  National realleges and reasserts each allegation set forth above as if fully set forth herein.

59.  Defendants' conduct as alleged herein constitutes dilution of National's trade dress, in violation of Section (43)(a) of the Lanham Act, 15 U.S.C. § 1125(c). As a direct and proximate result of Defendants' conduct, National has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

60.  Defendants' conduct as alleged herein was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting enhanced, treble and punitive damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## THIRD CAUSE OF ACTION
### Reverse Palming-Off
### (Against All Defendants)

61.  National realleges and reasserts each allegation set forth above as if fully set forth herein.

62.  Defendants' conduct as alleged herein constitutes reverse palming-off of National's product as Defendants' own, in violation of Section (43)(a) of the Lanham Act, 15 U.S.C. § 1125(a). As a direct and proximate result of Defendants' conduct, National has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

63.  Defendants' conduct as alleged herein was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting enhanced, treble and punitive damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## FOURTH CAUSE OF ACTION
### False Advertising and Labeling
### (Against All Defendants)

64.  National realleges and reasserts each allegation set forth above as if fully set forth herein.

65.  Defendants' conduct as alleged herein constitutes false advertising and labeling so as to intentionally cause confusion of product identity among consumers, in violation of Section (43)(a) of the Lanham Act, 15 U.S.C. § 1125(a). As a direct and proximate result of Defendants' conduct, National has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

66.  Defendants' conduct as alleged herein was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting enhanced, treble and punitive damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## FIFTH CAUSE OF ACTION
### False Designation of Origin
### (Against All Defendants)

67.  National realleges and reasserts each allegation set forth above as if fully set forth herein.

68. Defendants' conduct as alleged herein constitutes false designation of origin, in violation of Section (43)(a) of the Lanham Act, 15 U.S.C. § 1125(a). As a direct and proximate result of Defendants' conduct, National has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

69. Defendants' conduct as alleged herein was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting enhanced, treble and punitive damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## SIXTH CAUSE OF ACTION
### Unfair Competition
### (Against All Defendants)

70. National realleges and reasserts each allegation set forth above as if fully set forth herein.

71. Defendants' conduct as alleged herein constitutes unfair competition, in violation of Section (43)(a) of the Lanham Act, 15 U.S.C. § 1125(a). As a direct and proximate result of Defendants' conduct, National has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

72. Defendants' conduct as alleged herein was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting enhanced, treble and punitive damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## EIGHTH CAUSE OF ACTION
### Breach of Contract
### (Against Defendants Bridge, Galaxy, Messa, Fredella, Lemberg, Bregman)

73. National realleges and reasserts each allegation set forth above as if fully set forth herein.

74. Defendants' conduct as alleged herein constitutes breach of contract in violation of the laws of the state of New York. As a direct and proximate result of Defendants' conduct, National has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

## NINTH CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against Defendants Bridge, Galaxy, Messa, Fredella, Lemberg, Bregman)

75. National realleges and reasserts each allegation set forth above as if fully set forth herein.

76. Defendants' conduct as alleged herein constitutes breach of the implied covenant of good faith and fair dealing in violation of the laws of the state of New York. As a direct and proximate result of Defendants' conduct, National has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

## TENTH CAUSE OF ACTION
### Reverse Palming Off
### (Against All Defendants)

77. National realleges and reasserts each allegation set forth above as if fully set forth herein.

78.  Defendants' conduct as alleged herein constitutes reverse palming off in violation of the laws of the state of New York.  As a direct and proximate result of Defendants' conduct, National has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

## ELEVENTH CAUSE OF ACTION
### Trade Dress Dilution
### (Against All Defendants)

79.  National realleges and reasserts each allegation set forth above as if fully set forth herein.

80.  Defendants' conduct as alleged herein constitutes dilution of National's products' trade dress in violation of the laws of the state of New York.  As a direct and proximate result of Defendants' conduct, National has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

## TWELFTH CAUSE OF ACTION
### False Advertising and Labeling
### (Against All Defendants)

81.  National realleges and reasserts each allegation set forth above as if fully set forth herein.

82.  Defendants' conduct as alleged herein constitutes false advertising and false labeling in violation of the general business laws of the state of New York.  As a direct and proximate result of Defendants' conduct, National has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

## THIRTEENTH CAUSE OF ACTION
### Unfair Competition
### (Against All Defendants)

83.  National realleges and reasserts each allegation set forth above as if fully set forth herein.

84.  Defendants' conduct as alleged herein constitutes unfair competition in violation of the laws of the state of New York.  As a direct and proximate result of Defendants' conduct, National has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

## FOURTEENTH CAUSE OF ACTION
### Deceptive Trade Practices
### (Against All Defendants)

85.  National realleges and reasserts each allegation set forth above as if fully set forth herein.

86.  Defendants' conduct as alleged herein constitutes deceptive trade practices in violation of the general business laws of the state of New York.  As a direct and proximate result of Defendants' conduct, National has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted.

## FIFTEENTH CAUSE OF ACTION
### Unjust Enrichment and Imposition of Constructive Trust
### (Against All Defendants)

87.  National realleges and reasserts each allegation set forth above as if fully set forth herein.

88.   Defendants' conduct as alleged herein has caused them to be unjustly enriched at National's expense in violation of the laws of the state of New York. As a direct and proximate result of Defendants' conduct, National has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted. Accordingly, National demands that a constructive trust be imposed for National's benefit on all revenues derived from the sale of any products manufactured by Defendants based on, arising out of, or otherwise derived from National's Confidential Information or National's products.

## SIXTEENTH CAUSE OF ACTION
### Tortious Interference with Contractual Relations
### (Against Defendants Bloomberg, Picasso, Independent, and Green Light)

89.   National realleges and reasserts each allegation set forth above as if fully set forth herein.

90.   The conduct of Defendants Bloomberg, Picasso, Independent, and Green Light and as alleged herein constitutes tortious interference with the contractual relations between National and the Bridge Defendants, in violation of the laws of the state of New York. As a direct and proximate result of Defendants' conduct, National has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted. Defendants' conduct as alleged herein is and was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting punitive damages.

## SEVENTEENTH CAUSE OF ACTION
### Tortious Interference with Prospective Economic Relations
### (Against All Defendants)

91. National realleges and reasserts each allegation set forth above as if fully set forth herein.

92. The conduct of Defendants as alleged herein constitutes tortious interference with the contractual relations between National and National's existing and potential clientele, in violation of the laws of the state of New York. As a direct and proximate result of their conduct, National has been harmed in an amount according to proof, and will suffer further, irreparable injury unless the requested relief is granted. Defendants' conduct as alleged herein is and was intentional, willful, wanton, malicious, oppressive, and reckless, thus warranting punitive damages.

## JURY TRIAL DEMAND

National requests a jury trial on all causes of action, which entitles it to a trial before a jury.

## DEMAND FOR RELIEF

WHEREFORE, National prays for judgment as to each Defendant, and all of them, jointly and severally, as follows, that:

A.    Defendants, and their agents, employees, servants, representatives, successors in interest, and all those in concert with Defendants, be preliminary and permanently enjoined from:

1.    Using in any manner the information designated as Confidential Information as referenced herein;

2.      Manufacturing, creating, designing, marketing, selling, advertising producing, making, or otherwise using in any manner any lighting fixture not originating with National, that is likely to cause confusion, deception, or mistake or that dilutes or is likely to dilute the distinctive quality thereof;

3.      Passing off, inducing, or otherwise enabling others to sell or pass off any products as and for products produced by National, not Defendants' or not produced under the control and supervision of National and approved by National for sale as National's;

4.      Engaging in any other conduct that tends to falsely represent, or is likely to confuse, mislead, or deceive purchasers, Defendants' customers, National's customers, and other members of the public to believe that Defendants' products are connected with National or are sponsored, approved, or licensed by National, or are in any way connected or affiliated with National;

5.      Further diluting and infringing National's trade dress;

6.      Further damaging National's goodwill; and

7.      Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs 1-7 herein.

B.      National be awarded compensatory damages in an amount to be determined at the time of trial but believed to be in excess of $30,000,000, and that such damages be enhanced and/or trebled;

C.      National be awarded punitive damages;

D.    All gross revenues earned by Defendants through the time of trial as a result of the conduct alleged herein be held in constructive trust and paid over to National and increased as appropriate under the exceptional circumstances of this case;

E.    National recover its reasonable attorneys' fees, costs, and expenses incurred herein;

F.    Plaintiffs be awarded prejudgment and post-judgment interest at the legal rate; and

G.    Plaintiffs recover such other and further relief as this Court deems just and proper.

Signed this    day of March, 2008.

Submitted by:

SHUSTAK & PARTNERS, P.C.
ERWIN J. SHUSTAK

_____
Erwin J. Shustak (ES 5617)
Shustak@shufirm.com
400 Park Avenue
New York, NY 10022
Telephone: (212) 688-5900
Facsimile: (212) 688-6151

Attorneys for Plaintiff

OF COUNSEL:

Jonah A. Toleno, Esq.
jtoleno@shufirm.com
Shustak & Partners, P.C.
401 West A Street, suite 2330
San Diego, CA 92101
619.696.9500

# Exhibit A

# NATIONAL LIGHTING COMPANY, INC.

## WORK-O-LITE COMPANY, INC.

July 28, 2005

Mr. Bob Blanchard
American Finishing
123 NJ Railroad Avenue
Newark, NJ 07105

Mr. Joe Mesa
Bridge Metal Work
717 South 3rd Avenue
Mt. Vernon, NY 10550

Blaise Fredela
Bridge Metal Work
717 South 3rd Avenue
Mt. Vernon, NY 10550

Dear Sir or Madam:

In connection with a potential transaction (the "Transaction") involving National Lighting Company, Inc., Work-O-Lite Company, Inc. (together with National Lighting Company, Inc., the "Company"), Galaxy Switchgear, Inc. and Bridge Metal Works, Inc. (together with GAlazy Switchgear, Inc., the "Enquirers"), the Enquirers have requested and will be provided with certain non-public or confidential information concerning the Company, including without limitation, technical information, formulas, pricing, manufacturing drawings, documents, data, or information, relating to devices, methods, materials, ideas, plans, processes, apparatus, designs, drawings, research, yields, or specifications. All such information so furnished is hereinafter referred to as "Confidential Information." In consideration of the Enquirers being furnished with such Confidential Information, the Enquirers agree as follows:

1. The Confidential Information will be kept confidential and will not, without the prior written consent of the Company, be disclosed by the Enquirers or their agents, employees or representatives (which term shall include the Enquirers' directors, officers, financing sources, advisors, counsel and accountants) ("Representatives"), in any manner whatsoever, in whole or in part. The Enquirers agree to disclose the Confidential Information only to its Representatives who need to know the Confidential Information for the purpose of evaluating the Transaction and who are informed by the Enquirers of the confidential nature of such information.

2.    All information and materials disclosed by the Company to the Enquirers or their Representatives shall be presumed to constitute Confidential Information and will be so regarded by the Enquirers. Confidential Information does not include information or records which (i) was or becomes generally available to the public other than as a result of a disclosure by the Enquirers or their Representatives, (ii) was or becomes available to the Enquirers on a non-confidential basis prior to its disclosure to the Enquirers or their Representatives by the Company or its Representatives or (iii) was or becomes available to the Enquirers on a non-confidential basis from a source (other than the Company or its Representatives) which has represented to the Enquirers that it is not bound by a confidentiality agreement with the Company or otherwise prohibited from transmitting any portion of the information by a contractual, legal or fiduciary obligation.

3.    If the transaction is not consummated, the Enquirers will, and will cause each of their Representatives to, upon request, return to the Company or destroy the originals and all copies of Confidential Information and the Enquirers will, and will cause each of its Representatives to, upon request, destroy all copies of any analyses, compilations, studies or other documents prepared by or for the Enquirers' internal use which reflect or were prepared based upon the Confidential Information.

4.    In the event the Enquirers or their Representatives are requested or required in any legal proceeding (by interrogatories, deposition requests for information or document subpoena or similar process) to disclose any Confidential Information, it is agreed that the Enquirers will provide the Company with prompt notice of such request(s) so that the Company may seek an appropriate protective order and/or waive compliance with the provisions of this Agreement. If, in the absence of a protective order or the receipt of a waiver hereunder, the Enquirers or their Representatives are nonetheless, in the written opinion of counsel furnished to the Company at least five business days prior to the date on which such disclosure is required, compelled to disclose Confidential Information or else stand liable for contempt or suffer other censure or penalty, the Enquirers or their Representatives, as the case may be, may, no earlier than the day on which it is last permitted to respond, disclose only such of the Confidential Information to the party compelling disclosure as counsel advises in writing is required by law, and will assist the Company in obtaining reliable assurance that confidential treatment will be accorded such Confidential Information. In any event, neither the Enquirers nor any of or their Representatives will oppose any action by the Company to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information.

5.    This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without regard to principles of choice or conflicts of law.

6.    The terms of this Agreement shall be effective for a period of five years from the date of execution.

Please acknowledge your acceptance of the foregoing by signing this letter below.

Very truly yours,

National Lighting Company, Inc.

By: _____

Work-O-Lite Company, Inc.

By: _____

ACKNOWLEDGED AND ACCEPTED:

American Finishing

_____

Bob Blanchard

Bridge Metal Work

_____
Joe Messa    MESSA

Bridge Metal Work

_____
Blaise Fredela    FREDELUS

Dated:   July ___, 2005

# Exhibit B

July ___, 2005

Galaxy Switchgear, Inc.
[address]

Bridge Metal Work, Inc.
[address]

Ladies and Gentlemen:

This letter of intent sets forth our mutual understanding concerning the terms and conditions of a transaction among Galaxy Switchgear, Inc., a New York corporation ("Galaxy") and Bridge Metal Work, Inc., a New York corporation, ("Bridge Metal" and together with Galaxy, "Buyer"), National Lighting Company, Inc., a New Jersey corporation (the "Company" or the "Seller" or "National Lighting") and Work-O-Lite Company, Inc., a New Jersey corporation ("Work-O-Lite"). This letter of intent outlines the parameters of a possible transaction and the parties to this letter of intent do not intend to create a legally binding agreement between them. A legally binding commitment will only result after the drafting, negotiation, execution and delivery of a definitive agreement and the obtaining of all necessary third party consents. The date of the signing of the definitive agreement is the Closing Date.

    1.    Asset Acquisition. Buyer shall purchase certain assets of Seller including goodwill, the right to the National Lighting name, catalog rights, product rights, intellectual property rights, and various tools and die, all as listed on Schedule A (the assets to be purchased are referred to herein as the "Assets"). Buyer shall not purchase, and Seller shall not sell to Buyer, the following assets of Seller: accounts receivable, inventory, cash, any machinery or equipment owned by Seller, existing sales backlog or open, unfilled orders or payables.

    2.    Representations and Warranties. The definitive agreement will contain normal representations and warranties.

    3.    Seller's Current Employees. Buyer and Seller agree to maintain this transaction in confidence and not share the subject of this transaction with any of Seller's current employees.

    4.    Closing Date. The Closing Date shall be _____, 2005 assuming due diligence investigations have been completed by both parties and definitive agreements have been drafted, negotiated, executed and delivered.

5.    Payment of Purchase Price and Security

(a) The total purchase price for the Assets shall be $_____.  The purchase price will be payable as per agreed payment plan with an initial payment of $_____ paid on the Closing Date. One year after the Closing Date, Buyer shall pay Seller $_____ with an accrued interest charge of the prime rate (as such term is published from time to time in the Wall Street Journal) (the "Interest Rate").  Two years after the Closing Date, Buyer shall pay Seller $_____ plus interest at the Interest Rate.  Three years after the Closing Date, Buyer shall pay Seller $_____ plus interest at the Interest Rate.  Four years after the Closing Date, Buyer shall pay Seller $_____ plus interest at the Interest Rate.  Five years after the Closing Date, Buyer shall pay Seller $_____ plus interest at the Interest Rate.   Buyer has the right to prepay the outstanding balance at any time.

(b) The purchase price will be secured by a performance bond purchased by GalaxyBridge for $10,000,000 renewable annually.  As security for the timely and full payment of the note referenced above, the following individuals shall execute personal guarantees in favor of Seller:

_____

6.    Exclusive License Agreement

In addition, at the Closing, Buyer and Work-O-Lite shall enter into a license agreement (the "License Agreement").  The License Agreement will cover the following:

(a)       Work-O-Lite's right to be the exclusive marketing agent and manufacturer's representative for Buyer.  Work-O-Lite shall be exclusively responsible for new product development for Buyer worldwide for the term of the License Agreement.

(b)       Work-O-Lite shall purchase all products from Buyer at designated prices with a blanket, "fill or orders placed by National" standing commitment, with agreed upon price increases which shall be no greater than the [manufacturer's wholesale  price index as promulgated, from time to time, by the Department of Labor or similar governmental agency which publishes such information ] with the exception of the products listed in Schedule B which Buyer agrees not to manufacture and Work-O-Lite shall be permitted to buy elsewhere.  Work-O-Lite gives Buyer the right of first refusal on other new products not in Buyer's current product line and as listed on Schedule C and components which it may need to purchase in its course of business.  The terms of the purchase of the new products shall be negotiated in good faith.  If the parties are unable to reach an agreement in thirty days, Work-O-Lite will pay Buyer net thirty days 2% ten day pay and other discounts to be arranged for prepayment and the parties may jointly develop and have the products manufactured by a third party other than Buyer.

(c)        Buyer shall not manufacture, produce, assemble, distribute or broker, whether under Buyer's own label or under a private label for any other lighting manufacturer, distributor, broker or sales agent without the prior written consent of Work-O-Lite in each instance.

(d)        Buyer shall be responsible for the ground transportation of the goods covered by the License Agreement for goods to be delivered within New York City, Connecticut and New Jersey. The prices quoted in the License Agreement are inclusive of this freight charge. Buyer shall provide adequate insurance on the shipped goods.

(e)        Buyer shall list Work-O-Lite [and Seller] on its Underwriters Laboratories.

(f)        Buyer shall carry product liability insurance with coverage of at least $10,000,000 and shall list Work-O-Lite [and Seller] as additional insured parties.

(g)        Buyer agrees not to sell, copy, imitate or license any of Seller's product designs without Seller's prior written consent.

(h)        The License Agreement shall contain a mutually agreed upon description of the pricing structure for Work-O-Lite's purchase of Buyer's products.

(i)        The term of the License Agreement shall be 10 years.

(j)        Work-O-Lite, as agent for Buyer, will be able to avail itself of Buyer's factory for purposes of allowing potential Work-O-Lite customers to visit the factory site to inspect it as such customers shall request.   Work-O-Lite shall also have access to Buyer's web site and other marketing materials and may incorporate all or any part of that web site and any printed materials into Work-O-Lite's web site or printed materials.

(k)        To ensure Buyer's performance as the sole supplier of lighting products to Work-O-Lite, at Closing Buyer shall deliver to Work-O-Lite a performance bond, in the minimum amount of $_____, issued by a company with a Best rating of A or better licensed to conduct business within the State of New Jersey or New York.  That performance bond shall state that it is issued to fully secure Buyer's entire timely fulfillment of its obligations to Work-O-Lite under the terms of the License Agreement and shall be renewed annually for each year during the term of the License Agreement. In the event the performance bond is not renewed by the company issuing it and is not replaced by a similar performance bond prior to the time of the expiration of the existing performance bond, it shall constitute a material breach by Buyer of its obligations under the License Agreement and Work-O-Lite shall immediately be released from any of its obligations under the License Agreement; the name "National" shall immediately revert back to the Seller and Work-O-

Lite shall be free to enter into another licensing agreement with another third party to have that party fulfill any orders for lighting fixtures that National may have.

8.    Right To Use Seller's Name. So long as Buyer is not in default under terms of either the definitive asset purchase agreement or the License Agreement, Buyer may use Seller's name for the conduct of its business. Seller shall not be responsible, in any fashion, for any liabilities or obligations of Buyer from and after the Closing Date.

9.    Expenses. The parties shall pay their own expenses in connection with the legal transactions contemplated by this letter of intent.

10.    Standstill. Seller and Buyer agree that upon execution and delivery of this letter of intent, and so long as Buyer is proceeding with the transaction in good faith, Seller shall not, for a period of the earlier of the execution and delivery of definitive documents or September 1, 2005, solicit, accept, negotiate, discuss, consider, accept proposals or otherwise take any action, directly or indirectly, in connection with any transaction involving the sale of Seller or its assets.

11.    Other Terms and Conditions. The Sales and License Agreements shall contain other Typical terms and conditions including, but not limited to:

(a) The agreements shall be binding upon and inure to the benefit of all parties successors and assigns.

(b) In the event of any dispute, any such dispute shall be resolved exclusively by the Federal or State Courts of New York City, New York County and, in the event of any such dispute, the prevailing party shall be entitled to recover all of its reasonable expenses incurred in connection with such litigation including, but not limited to legal fees, expert fees and court costs.

This letter supersedes all prior correspondence and verbal discussions between Buyer and Seller.

0055.31/N0001864.DOC;1

Very truly yours,

National Lighting Company, Inc.

By: _____

Work-O-Lite Company, Inc.

By: _____

Galaxy Switchgear, Inc.

By: _____

Bridge Metal Work, Inc.

By: _____

0055.31/NC001864.DOC;1

# Exhibit C













